Filed 11/17/15  P. v. Mayfield CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMES L. MAYFIELD,<br><br>        Defendant and Appellant. | A140801<br><br>(San Francisco County<br>Super. Ct. No. SC213413) |

In this cold case prosecution, defendant James L. Mayfield was convicted following a jury trial of first degree murder (Pen. Code, § 187), and sentenced to life in prison with the possibility of parole.  In this appeal, he claims the trial court prejudicially erred in admitting evidence of his 1969 rape conviction.  He also challenges the jury instruction on prior act evidence, and asserts the admission of the victim's autopsy report violated his right to confrontation.  We reject these contentions and affirm the judgment.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On October 5, 2010, an information was filed accusing defendant of the 1976 murder of Jenny Read in San Francisco.  Use of a knife was also alleged (Pen. Code, § 12022).  A jury trial commenced on September 23, 2013.

*I.     The Prosecution*

*A.  The Crime and Defendant's Arrest*

In May 1976, Michael Kinney was a leather craftsman who rented an artist's studio at 15th and Carolina Streets in San Francisco.  The building was a large warehouse

that had been divided into studio spaces for several artists. One of those artists was Read, a sculptress who lived and worked in a studio/apartment upstairs from Kinney's studio.

On May 18, 1976, Kinney agreed to drive Read to an appointment the following morning. When he went to pick her up at 8:00 a.m. on May 19, 1976, there was no answer at her door. He stepped back a few feet and yelled up at her window to get her attention, but there was no response. Most of the tenants kept a spare key in a secret place inside a room in the back of the building. Thinking Read had overslept, Kinney retrieved a key and opened her front door. Walking up the stairs to her unit, he saw her body on the floor at the top of the stairs. He returned downstairs and asked a male friend who was waiting for him in the car to accompany him and they both went upstairs to the apartment.

Read was lying on the floor in a large pool of blood. Her hands were bound behind her back. Her pants were pulled down, off one leg entirely and around the ankle of the other. Kinney believed Read was dead, but wiggled one of her fingers just in case and found it cold and stiff. He called the police. Neither he nor his friend disturbed anything around the body at the crime scene.

San Francisco Police Department (SFPD) officer Raymond Kilroy responded to the scene. There was no sign of forced entry.

Dr. Amy Hart, the chief medical examiner of San Francisco, testified that she attained that position in 2005 when her predecessor, Dr. Boyd Stephens, retired. The legal mandate of the medical examiner's office is to investigate all sudden, unexpected, and violent deaths. In performing an autopsy, the physician may take specimens, swabs, or slices of organs in order to examine them under a microscope. Those specimens are stained and put onto a glass slide to view under the microscope.

Hart retrieved the autopsy report from the May 1976 bound volume of historical autopsy reports. The report was signed by Stephens on May 19, 1976. The report stated that the victim was five feet two inches tall and weighed 103 pounds. When she was found, her hands were securely tied behind her back with a scarf. A knife was still embedded in a wound in her chest. A crusted whitish material was found in her crotch

area, which later tested positive for sperm. Her pubic hair was matted, and swabs from that area showed "large numbers of intact sperm." A smaller number of sperm were found in the victim's vagina, mouth, and rectum.

The victim had defensive wounds to her left hand and injuries to her neck, which were consistent with having been grabbed by the neck. She sustained 13 knife wounds, 11 of them to her upper chest and abdomen. The two remaining wounds were on the inside and outside of her left knee. The pants found at the scene had no knife holes in them. The knife wounds were consistent with the knife found in her body. The wounds were hemorrhagic, which indicated they were inflicted around the time of death. Hart opined the cause of death was multiple stab wounds, and that the victim bled to death.

SFPD officer Joseph Toomey testified that he interviewed defendant on August 3, 2009, after contacting him on a street in San Francisco. Defendant became a person of interest in the crime because his DNA was in the state database and was matched to DNA in this case in 2009. Defendant agreed to talk. Toomey told him he was investigating a cold case involving burglaries from 1976. He showed defendant pictures of the victim, but defendant stated that he did not recognize her. Defendant agreed to give cheek swabs for a DNA sample. He also agreed to go for a drive. Toomey drove to the scene of the murder, though the victim's building had been replaced by a new building. Defendant said he had never been in a building at that location, and had only been in the area 10 years previously when he used to recycle. Defendant was subsequently arrested.

### B. DNA Evidence

Charles Morton, a criminalist, testified that he started working at the Institute for Forensic Sciences in 1974. In 1978, the company divided itself into three separate companies. Morton bought the criminalistics laboratory and operated it in conjunction with the other laboratories, but as a separate company. He sold it to a company called Forensic Analytical Systems (FAS) in 1996. His company's case files and evidence were then transferred to FAS's laboratory in Hayward. During the transfer, all the evidence, including materials at issue in this case, remained in a freezer, which was physically transported from one facility to another, with no time for the contents to thaw.

On May 28, 1980, Stephens asked Morton to open a case file because he wanted to bring in some evidence.

On June 10, 1980, Morton received the evidence from Stephens. The evidence consisted of three red-top test tubes with labels. The case was assigned to Michael Grubb, a criminalist who worked for Morton at the time. After Grubb completed his work on some of the tubes, he prepared some slides. The slides were made within a few days and were put into a separate container and stored in the same freezer as the main tubes. The material was kept in the same freezer from 1980 to 2003. Morton testified that DNA evidence does not need to be frozen.

Grubb testified that he analyzed the material received from Stephens over several days and prepared a report. Two of the test tubes contained hairs with some fluid, and one contained a portion of a swab also in some fluid. After examination, he found that the material from all three tubes, which he mounted on three different slides, was essentially all sperm with no indication of mixture with vaginal material. Grubb also mounted the hairs onto slides. During his examination he used fresh, clean, smaller tubes and slides, transferring specimens with new pipette each time to avoid contamination. After his examination, the slides, tubes, and original evidence materials were packaged, labeled, and placed in the freezer. None of the stains or mounting medium that he used would have negatively impacted the ability to conduct a subsequent DNA analysis.

On October 21, 2003, an FSA evidence technician released an envelope containing the microscope slides prepared by Grubb to Pamela Wermes of the SFPD.

On October 22, 2003, former SFPD criminalist Patrick Paton received the evidence from Wermes. His job was to examine evidence for biological material that might contain DNA. He removed the slides, three of which were broken, and repackaged them.

Matthew Gabriel, a former analyst at the SFPD crime lab, tested the slides for DNA in 2004. He testified at trial as an expert witness in the area of forensic DNA analysis. In conducting DNA analysis, an analyst will first remove a small sample of DNA from the cellular material, such as white blood cells, semen, or saliva. The material

will be subjected to a series of chemicals to produce clean, purified DNA. The next step is to determine how much DNA is in the sample. In this case, Gabriel used a differential extraction process to separate out the female cells from the male cells and to remove their DNA. A type of DNA testing called polymerase chain reaction (PCR) analysis was then conducted. This process generates multiple copies (amplifies) target segments of DNA. These DNA profiles are then analyzed and interpreted.

Gabriel testified that while prior mounting on a slide can physically affect a specimen, it will not hinder the accuracy of a DNA analysis. Staining, lack of refrigeration, or the presence of bacteria could degrade DNA, but these circumstances would not change one DNA profile into another.

Gabriel followed proper lab procedure in testing the samples in this case. Safeguards were used to prevent contamination. The procedures he used for DNA analysis and typing are accepted and followed by the forensic science community. He generated DNA profiles from the samples he tested and generated a report based on the data. His report, which was prepared in 2005, presented a profile of an unknown suspect. The profile was not uploaded to the DNA database until 2009.

Cherisse Boland is a supervising criminalist with the SFPD crime lab in the forensic biology unit. She also testified as an expert in forensic DNA analysis. She tested the victim's panties in April of 2009. The underwear had numerous reddish brown stains that tested positive for blood. She tested several areas of the panties for the presence of sperm, including the crotch. The tests were negative for sperm.

Boland also did DNA tests on reference samples taken from defendant's oral swabs and from swabs taken from the victim's shirt. She compared the victim's DNA profile and the profile from defendant's reference sample to the DNA profiles derived from the slides made from the swabs originally taken by Stephens. Four of those slides had already been analyzed by Gabriel. Boland analyzed a fifth sample, which was taken from a vaginal slide prepared by Stephens in 1976. She followed all the standard lab protocols for processing DNA samples. Within the sample she tested, there was a single sperm donor whose DNA profile matched defendant. The chance of a randomly chosen

5

individual having that same DNA profile is 1 in 708 million African American individuals, 1 in 4.9 million Caucasian individuals, 1 in 29 million Hispanic individuals, and 1 in 52 million Asian individuals.

SFPD criminalist Mignon Dunbar reevaluated the testing done by Boland and Gabriel. She noted that one of the samples reflected a very small peak that was present at one of the copied sections of DNA. This peak could indicate a possible minor donor at one location in the testing. That peak could also be explained by "stutter" in the machine, or error in the amplification process of the DNA. These peaks appeared at a much lower concentration of DNA than the material donated by defendant. Dunbar conceded that this could have been evidence of more than one sexual assailant.

Dunbar also did a more sensitive statistical calculation, which eliminated the victim's DNA. This yielded probability calculations for a match of the DNA found on the victim and matched to defendant of 1 in 24 trillion Caucasians, 1 in 43 trillion African Americans, one in 53 trillion Hispanics, and 1 in 117 trillion Asians.

### C. Prior Rape Conviction

The jury was given six pages of a transcript from a preliminary hearing conducted in 1968 in a case in which defendant was charged with rape. In the transcript, the complaining witness (who was deceased by the time of this trial) recalled that one afternoon at about 2:30 p.m., she was in her apartment when she answered a knock at the door. Defendant was at the door. She had seen him about a half hour before when the door to her apartment was open. He asked her if she recognized a handkerchief and walking stick that he held. When she said she did not, he said, "Look again." As she tried to close the door, he pushed his way into the apartment. He walked around her apartment and then raped her twice.

At trial, it was stipulated that the complaining witness identified defendant at the preliminary examination and that he was convicted of rape by force and violence on June 13, 1969. The parties also stipulated that defendant was living in San Francisco and was free from custody between September 17, 1975, through August 3, 1976, and that the victim (Read) was not married.

6

## II. The Defense

Judy Malmgren, a forensic nurse examiner and registered nurse, testified as an expert in sexual assault examinations and forensic nursing. She reviewed the documents in this case. She found no evidence in the report indicating there had been penetration of the victim's vagina or anus. The lack of injuries may or may not indicate that the sex was consensual. The sperm found in the rectum could have been pushed in by the examiner when he took the swabs. However, sound medical practice would have been to avoid pushing sperm into the rectum while collecting the swabs.

DNA analysis expert Keith Inman reviewed Dunbar's report, as well as the raw data from this case. When he looked at all the DNA data he received, he was able to find evidence of other alleles not belonging to defendant or the victim. He opined that one data peak in particular (the same peak Dunbar interpreted as a possible stutter) did not appear to be static, echo, or some other artifact, because it showed up in almost all of the samples that were analyzed. Other low-level allele data reinforced the inference that there was an additional donor to the samples. The other person's DNA could have been contributed by contamination in the laboratory, but Inman did not think that possibility was likely. In arriving at his conclusions, Inman used an analytical threshold that is lower than the threshold used by Dunbar, which is how Inman arrived at some of the peaks he testified to. Most labs set the threshold higher in order to be conservative, a practice that Inman criticized because it can cause real alleles to be missed.

SFPD inspector Ronan Shouldice testified that he analyzed two latent prints that had been taken from the crime scene to see if they matched defendant. Neither print was a match.

## III. The Verdict and Sentencing

On October 8, 2013, the jury found defendant guilty of first degree murder. The jury also found the knife-use allegation to be true. The trial court later struck the knife-use allegation on the People's motion. Defendant was sentenced to life in prison with the possibility of parole.

**DISCUSSION**

**I.** *Admission of Evidence of the 1968 Rape*

    *A. Background*

Defendant challenges the trial court's ruling admitting evidence of the 1968 rape and his resulting 1969 conviction. He asserts the evidence of the prior offense was more prejudicial than probative. We disagree.

The prosecutor moved under both Evidence Code sections 1101, subdivision (b), and 1108[1] to introduce evidence concerning defendant's 1969 rape conviction to show he was disposed or inclined to commit sexual offenses, as well as to prove identity, motive, and intent. Defendant moved to exclude such evidence. Before trial, the trial court and counsel engaged in numerous discussions, supported by briefing, on whether two categories of evidence would be admitted against defendant as prior sexual misconduct. In addition to the rape charge that led to the conviction, the prosecution proffered a psychologist's report from 1968, which reported that defendant had admitted to committing five forcible sexual offenses. The court ultimately declined to admit evidence of this report.

The trial court initially determined evidence of the rape conviction would be more prejudicial than probative in the absence of proof that a rape had occurred in the present case. However, if substantial evidence was introduced during trial that would allow a jury to find the current case involved a forcible sexual offense, then the court would consider admission under sections 1101, subdivision (b), and 1108. The court would also consider all the factors contained in section 352 to determine whether the People could introduce the prior conviction. However, the court indicated the evidence would likely be admissible because the conviction was not remote, the prior sexual offense was relevant to propensity, the degree of certainty was high because he had admitted the prior offense by pleading guilty, and the evidence would not be likely to confuse, mislead, or distract the jurors from their main inquiry. The court also noted the prior offense was

---

[1] All further statutory references are to the Evidence Code except as otherwise stated.

very similar to the charged offense, and opined that the impact of the earlier rape would not be more prejudicial than the facts surrounding the current crime. As noted above, evidence of the prior rape conviction was introduced at trial.

### B. General Principles

Generally, evidence of other crimes or misconduct is inadmissible when it is offered to show that a defendant had the criminal disposition or propensity to commit the crimes charged. (§ 1101, subd. (a).) However, evidence of other crimes or misconduct by a defendant is admissible if it tends to " 'logically, naturally, and by reasonable inference . . . establish any fact material for the people, or to overcome any material matter sought to be proved by the defense.' " (*People v. Peete* (1946) 28 Cal.2d 306, 315.) Section 1101, subdivision (b), codifies this exception to the general rule of inadmissibility by providing for the admission of such evidence "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act . . . did not reasonably and in good faith believe that the victim consented) other than [the defendant's] disposition to commit such [crimes or bad acts]."

" 'Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent.' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328.) In order to be admissible to prove the existence of a common design or plan, evidence of uncharged misconduct must demonstrate " 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).)

Section 1108 allows the admission of uncharged sexual acts to show the defendant's propensity to commit sexual offenses. The section is a significant departure from the general rule that evidence of propensity to commit crime is not admissible. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159–1160.) The admissibility of such evidence is dependent on the trial court's review of the proposed testimony in light of

9

section 352 to weigh its probative value against its prejudicial effect. (*People v. Loy* (2011) 52 Cal.4th 46, 62 (*Loy*); *People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) Section 1108, subdivision (a) provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Section 1108, subdivision (a) allows admission, in a criminal action in which the defendant is accused of one of a list of sexual offenses, of evidence of the defendant's commission of another listed sexual offense that would otherwise be made inadmissible by section 1101, subdivision (a). The prior and charged offenses are considered sufficiently similar if they are both sexual offenses enumerated in section 1108.[2] (*People v. Frazier* (2001) 89 Cal.App.4th 30, 41.)

In other words, evidence of defendant's prior rape offense and conviction is admissible to prove he has a propensity to commit the charged offense of murder in the course of rape unless such evidence is excluded as more prejudicial than probative under section 352. (§ 1108, subd. (a).) As our Supreme Court stated in *Falsetta, supra,* 21 Cal.4th 903, in balancing such section 1108 evidence under section 352, "trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other . . . offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, at p. 917.)

---

[2] Section 1108 applies to this case: "Because a murder during the course of a rape involves conduct, or at least an attempt to engage in conduct, proscribed by Penal Code section 261, we conclude that a defendant accused of such a murder is accused of a sexual offense within the meaning of section 1108." (*People v. Story* (2009) 45 Cal.4th 1282, 1285.)

10

On appeal, we review the admission of other acts or crimes evidence under either section 1101 or section 1108 for an abuse of the trial court's discretion. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286.) The determination as to whether the probative value of such evidence is substantially outweighed by the possibility of undue consumption of time, unfair prejudice or misleading the jury is "entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence." (*People v. Fitch* (1997) 55 Cal.App.4th 172, 183.) We will not find that a court abused its discretion in admitting such other acts evidence unless its ruling " 'falls outside the bounds of reason.' " (*People v. Kipp* (1998) 18 Cal.4th 349, 371; see *People v. Ochoa* (2001) 26 Cal.4th 398, 437–438.)

### C. Analysis

#### 1. No Abuse of Discretion

On appeal, defendant contends the trial court abused its discretion in admitting evidence of his 1969 rape conviction. He specifically argues such evidence was more prejudicial than probative under section 352,[3] relying on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*). He also stresses that because the evidence of the prior sexual offense was used to establish propensity, under *People v. Smallwood* (1986) 42 Cal.3d 415 the probative value of such evidence "must be extraordinarily high to be admissible." We conclude there was no abuse of discretion.

*Harris* is distinguishable. In *Harris,* a nurse was accused of fondling two of his patients. (*Harris*, *supra*, 60 Cal.App.4th at pp. 730–733.) The appellate court found the trial court erred in admitting evidence implicating him in a decades-old incident in which the victim was beaten and sexually exploited during a ferocious attack. (60 Cal.App.4th at pp. 733–735.) *Harris*'s facts are entirely different from those here. There, the prior offense was forcible and the evidence of it was "inflammatory in the extreme." (*Id*. at

---

[3] Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

p. 738, italics omitted.)  The charged sexual offenses were, by contrast, not forcible but involved breaches of trust.  Thus the charged offenses were "of a significantly different nature and quality than the violent and perverse attack on a stranger that was described to the jury."  (*Ibid*.)  Moreover, the prior offense occurred 23 years before the charged offenses, a factor the appellate court found weighed in favor of exclusion.  (*Id*. at p. 739.)  Nothing in *Harris* compels the conclusion that the trial court here abused its discretion in admitting the evidence of defendant's prior conviction.

We also disagree with defendant's assertion that the prejudicial nature of the evidence outweighed its probative value.  The prejudice with which section 352 is concerned is the creation of emotional bias against the defendant through evidence with little probative value, "not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence."  (*People v. Karis* (1988) 46 Cal.3d 612, 638.)  " '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is "prejudicial."  The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying section 352, "prejudicial" is not synonymous with "damaging." ' "  (*Ibid*.)

As our Supreme Court stated in *Loy, supra,* 52 Cal.4th 46 at p. 62, "[e]vidence of previous criminal history inevitably has some prejudicial effect.  But under section 1108, this circumstance alone is no reason to exclude it.  '[S]ection 1108 affects the practical operation of . . . section 352 balancing " 'because admission and consideration of evidence of other sexual offenses to show character or disposition would be no longer treated as intrinsically prejudicial or impermissible.  Hence, evidence offered under [section] 1108 could not be excluded on the basis of [section] 352 unless "the probability that its admission will . . . create substantial danger of undue prejudice" . . . substantially outweighed its probative value concerning the defendant's disposition to commit the sexual offense or offenses with which he is charged and other matters relevant to the determination of the charge.  As with other forms of relevant evidence that are not subject

to any exclusionary principle, *the presumption will be in favor of admission*.' "
[Citation]' [Citation.]"

Here, the probative value of the evidence was substantial. As in the prior crime, it was inferable that defendant had observed a single woman alone in an apartment, somehow forced his way in without having to break through the door or window, and committed a rape behind the closed door of the apartment. Evidence of the circumstances surrounding his prior conviction for rape was also very relevant to the issue of whether the sexual conduct was nonconsensual. Because defendant claimed at trial that the sexual conduct was consensual and unrelated to the victim's murder, and because there were no living witnesses to the events surrounding the crime, the character of the sexual activity was plainly in issue.

As we have mentioned, the trial court held a lengthy hearing on the admissibility of the prior conviction. The court recognized its responsibility to apply the section 352 weighing process and did so at some length. The court considered the remoteness of the prior act, whether it was sufficiently similar, the length of time necessary to present the evidence, as well as questions of relevance and potential prejudice.

To the extent defendant suggests section 1108 is unconstitutionally applied in this case because it allowed the jury to convict him solely on propensity evidence, we note that in *Falsetta,* the Supreme Court rejected the argument the Legislature may not constitutionally permit a jury to consider the defendant's propensity to commit a particular type of crime in deciding the defendant's guilt of a current offense of the same type of crime: "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*Falsetta*, *supra*, 21 Cal.4th at p. 913.) No due process violation is shown.[4]

---

[4] Defendant also asserts the evidence was inadmissible under section 1101, subdivision (b), because "there is no proof of a scheme or plan of any type in the Read encounter" because "[w]e do not know how the attacker acted in the Read case, so we cannot say if it bore any similarities to the [prior] matter." However, the jury could have inferred that defendant committed the charged offense based on a common plan of forcibly entering

13

## *2. The Error, If Any, Was Harmless*

Even if the trial court did abuse its discretion in admitting the prior conviction, we would find the error to be harmless. Error in the admission of prior conviction evidence is reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Anderson* (1987) 43 Cal.3d 1104, 1137.) Under the *Watson* standard, "[t]he reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) In applying this standard, we examine " 'the entire cause, including the evidence.' " (*Watson,* at p. 836.)

Defendant's theory that the victim had consensual sex with him, and then was killed shortly thereafter by someone else, does not fit with the evidence of the crime. The victim was found with 13 stab wounds in a pool of blood on the floor of her apartment. Her hands were tied behind her back. Her pubic area was covered by defendant's sperm. The arrangement of the clothing on her body clearly suggests a sexual assault took place. While the stab wounds on her upper body went through her clothing, there were two stab wounds near her left knee but no cuts in her jeans. This established conclusively that she was stabbed after her pants were removed. An analysis of her panties showed no presence of sperm, suggesting the stabbing occurred before the victim had the opportunity to pull her pants back on. In sum, there was substantial evidence indicating that the murder occurred during the course of a sexual assault committed by defendant.

While defendant argues that the DNA analysis showed evidence of a third person's DNA, that evidence was inconclusive. The evidence of possible weak spikes at a very few loci was vague evidence of the possible presence of a third party. Further, given that the physical specimens were gathered in 1976, the faint evidence of a third party could be explained by inadvertent contamination. In 1976, there was no understood

---

apartments of women who were alone and then sexually assaulting them. The evidence of his prior crime established that it was sufficiently similar to the charged offenses to authorize its admission for this purpose. (See *Ewoldt, supra,* 7 Cal.4th at pp. 402–407.)

14

need to observe the strict laboratory protocols that are currently in place, because the gathering of DNA evidence was not a realistic possibility at that time.[5]

With respect to the arguments made by the prosecutor tying the circumstances of the 1968 rape to the present case, any potential prejudice was cured here by the court's instructions to the jury that they must decide the facts using only the evidence presented at trial, that nothing the attorneys said was evidence, including their arguments, and that they must follow the law as given to them by the court. We presume that the jury followed these instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436; *People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8.) We conclude it is not reasonably probable the verdict would have been more favorable to the defendant absent the admission of the evidence of the prior rape and his conviction.[6]

## II.    CALCRIM No. 1191

Defendant argues that the giving of CALCRIM No. 1191[7] deprived him of due process of law because it allowed him to be convicted, at least in part, on evidence

---

[5] Defendant notes a foreign hair was found on the victim's thigh. We agree with the People that because her body was found on the floor, the presence of one hair was inconclusive.

[6] We reject defendant's claim that admission of evidence of the prior conviction must be reviewed under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. For the reasons stated above, the purported error in admitting evidence of defendant's prior uncharged conduct did not result in a fundamentally unfair trial implicating his due process or other federal constitutional right.

[7] CALCRIM No. 1191 provides: "The People presented evidence that the defendant committed the crime[s] of _____ *<insert description of offense[s]>* that (was/were) not charged in this case. (This/These) crime[s] (is/are) defined for you in these instructions. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense[s]. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offense[s], you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to

15

proven by a preponderance of the evidence.  Defendant's counsel recognizes this issue has been resolved by our Supreme Court.  Counsel raises the issue here to preserve any remedies defendant may have in the federal courts.

In *People v. Reliford* (2003) 29 Cal.4th 1007, 1011–1012, the court upheld CALJIC No. 250.01.  The appellate courts have held that CALCRIM No. 1191 is indistinguishable from CALJIC No. 250.01.  (*People v. Johnson* (2008) 164 Cal.App.4th 731, 739–740; *People v. Wilson* (2008) 166 Cal.App.4th 1034, 1052–1053; *People v. Cromp* (2007) 153 Cal.App.4th 476, 479–480.)  Defendant does not contend that CALCRIM No. 1191 is distinguishable from CALJIC No. 250.01.  He also recognizes we are bound to follow our Supreme Court's decision on this issue.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450).  We find no error in the use of CALCRIM No. 1191 in this case.

### III.    *Evidence Derived From the 1976 Autopsy*

Defendant claims he was deprived of his right to confrontation because he could not cross-examine the medical examiner who performed the victim's autopsy.  Stephens died prior to trial and Hart testified concerning his autopsy report.  The trial court admitted the entire autopsy report into evidence, redacting the diagnosis and cause of death.  Defendant claims the autopsy report was not admissible, and asserts expert testimony based on the autopsy report and on the specimens collected from the victim also was not admissible because the witnesses repeated testimonial statements made by Stephens in his autopsy report.  We conclude that because the redacted autopsy report did not include any testimonial statements, there was no confrontation clause violation.

---

commit [and did commit] _____ *<insert charged sex offense[s]>*, as charged here.  If you conclude that the defendant committed the uncharged offense[s], that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of _____ *<insert charged sex offense[s]>*.  The People must still prove (the/each) (charge/ [and] allegation) beyond a reasonable doubt.  [¶]  [Do not consider this evidence for any other purpose [except for the limited purpose of _____ *<insert other permitted purposes, e.g., determining the defendant's credibility>*].].

In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the high court held that a criminal defendant's Sixth Amendment right to confrontation precludes the admission of testimonial statements by a witness who is not subject to cross-examination at trial, even if those statements fall within an exception to the hearsay rule. In *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), the court applied this holding to preclude the prosecution from relying on certificates setting forth the results of scientific tests on suspected controlled substances, holding that the prosecution was obligated, instead, to produce the lab analysts who conducted the tests so that the defense could cross-examine them. In *Bullcoming v. New Mexico* (2011) 564 U.S. __ [131 S.Ct. 2705, 2717; 180 L.Ed.2d 610], the court held that testimony of a laboratory analyst parroting the results of a blood alcohol test he did not perform or observe, together with admission of a formalized report, violated the defendant's confrontation rights. In *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221, 2243–2244; 183 L.Ed.2d 89], the court held that testimony by a police forensic biologist about a DNA match that relied in part on a DNA profile generated at another laboratory did not violate the confrontation clause.

In the present case, defendant relies on *Crawford, supra,* 541 U.S. 36, and *Melendez-Diaz, supra,* 557 U.S. 305, in arguing that the trial court committed reversible error in admitting into evidence Stephens's autopsy report, the specimens collected from the victim's body and the slides made from the specimens, as well as the expert witnesses' testimony made in reliance on the autopsy report and specimens. Defendant's arguments lack merit.

In *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), our Supreme Court considered *Crawford* and its progeny, and reasoned that "statements in an autopsy report describing a nontestifying pathologist's observations about the condition of the victim's body are not testimonial because the 'primary purpose' of recording such facts does not relate to a criminal investigation. [Citation.] [The court] also described these statements, which 'merely record objective facts,' as being 'less formal than statements setting forth a pathologist's expert conclusions' about the victim's cause of death." (*People v.*

17

*Trujeque* (2015) 61 Cal.4th 227, 276, italics omitted.) The *Dungo* court held that this type of testimony was properly admitted, notwithstanding *Crawford, supra,* 541 U.S. 36, and *Melendez-Diaz, supra,* 557 U.S. 305. (*Dungo, supra,* 55 Cal.4th at p. 621.)

The *Dungo* court majority reasoned that the statements in an autopsy report describing the condition of the body "are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature." (*Dungo, supra,* at p. 619.) The court also noted that "[t]he usefulness of autopsy reports . . . is not limited to criminal investigation and prosecution; such reports serve many other equally important purposes." (*Id.* at p. 621.) Thus, the court held that the testifying pathologist's description of the victim's injuries, which was based on the autopsy report, was admissible even though the autopsy had been performed by a different physician who was not subject to cross-examination. (*Ibid.*)

In *People v. Leon* (2015) 61 Cal.4th 569, the Supreme Court reiterated that *Dungo*, *supra*, 55 Cal.4th 608, found no confrontation clause violation when a testifying pathologist expressed forensic opinions based on the medical observations in the nontestifying pathologist's autopsy report. The court noted, however, that the report itself had not been admitted into evidence in *Dungo*. (*Leon*, at p. 604.) In *Leon,* the entire autopsy report was admitted, and the testifying pathologist's testimony recited the observations and conclusions contained therein. (*Ibid.*) Rather than deciding whether admission of the report violated the defendant's confrontation right, the court held that even if the testimony and report were erroneously admitted, the error was harmless beyond a reasonable doubt because the cause of the victim's death was undisputed. (*Ibid.*)

While the *Leon* court did not directly rule on the admissibility of autopsy reports, the court did affirm that the admission of autopsy photographs does not violate the confrontation clause. The court reasoned: "Hearsay is defined as an out-of-court 'statement.' [Citation] A statement is defined for this purpose as an 'oral or written verbal expression or . . . nonverbal conduct *of a person*' intended as a substitute for oral

18

or written expression. [Citation.] Only *people* can make hearsay statements; *machines cannot*." (*Leon*, *supra*, 61 Cal.4th at p. 603, first italics in original, second and third italics added.) Further, the court explained, "[i]t is also clear that testimony relating the testifying expert's own, independently conceived opinion is not objectionable, even if that opinion is based on inadmissible hearsay. [Citations.] A testifying expert can be cross-examined about these opinions. The hearsay problem arises when an expert simply recites portions of a report prepared by someone else, or when such a report is itself admitted into evidence. In that case, out-of-court statements in the report are being offered for their truth. Admission of this hearsay violates the confrontation clause if the report was created with sufficient formality and with the primary purpose of supporting a criminal prosecution." (*Ibid*.) As to autopsy reports themselves, the *Leon* court noted "a majority of this court [in *Dungo*, *supra*, 55 Cal.4th 608] has distinguished between statements that set forth anatomical and physiological observations and those that relate the pathologist's conclusions as to cause of death." (*Ibid*.)

While defendant asserts the confrontation clause bars essentially all of the DNA evidence admitted in this case, *Leon* affirms the principle that physical evidence is nontestimonial. Additionally, the confrontation clause was not implicated by the expert witnesses' testimony because they were all subject to cross-examination at trial. Further, the autopsy report itself, unlike the report at issue in *Leon, supra,* 61 Cal.4th 569, did not contain testimonial statements because Stephens's opinions regarding the victim's diagnosis and cause of death were redacted. Accordingly, defendant's confrontation clause argument fails.

We also reject defendant's argument that the chain of custody testimony was inadequate to provide a foundation for the specimen swabs. "In a chain of custody claim, ' "[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not

19

that the evidence analyzed was not the evidence originally received.  Left to such speculation the court must exclude the evidence.  [Citations.]  Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." [Citations.]' [Citations.]  The trial court's exercise of discretion in admitting the evidence is reviewed on appeal for abuse of discretion."  (*People v. Catlin* (2001) 26 Cal.4th 81, 134.)

The only putative weakness in the chain of custody was Stephens's collection, labeling, and storage of the original evidence.  Before trial, however, Hart testified extensively as to the standard methods of collecting evidence and keeping records in 1976, and established that those methods were identical to ones currently in use.  Once evidence was admitted showing that Stephens performed the autopsy and that all of the specimen evidence was labeled in accordance with standard protocol, the initial chain of custody was established.  Defendant does not raise any other issues with respect to the chain of custody of the DNA evidence.

## DISPOSITION

The judgment is affirmed.

_____
DONDERO, J.

We concur:


_____
HUMES, P.J.


_____
MARGULIES, J.

A140801